HON. HENRY McIVER, CHIEF JUSTICE.
HON. YOUNG J. POPE, ASSOCIATE JUSTICE.
HON. EUGENE B. GARY, ASSOCIATE JUSTICE.
HON. IRA B. JONES, ASSOCIATE JUSTICE.

*EX PARTE* HOWLETT v. GARNER, *IN RE* HOWLETT v. THE CENTRAL CAROLINA LAND & IMPROVEMENT CO.

1. EQUITY—MUTUAL MISTAKE.—When two lots are sold under one proceeding, and by honest mistake at sale the one is bid off for the other, such a mutual mistake has been made as equity will relieve the parties from.

2. IBID.—ACCOUNTING.—A party who buys, under honest mutual mistake, a lot with valuable buildings in place of a vacant lot, must be allowed credit for taxes and necessary expenditures on the property as against rents collected.

3. COSTS.—Finding as to costs affirmed.

Before WATTS, J., Darlington, May, 1896. Modified.

Petition of A. A. Howlett *v.* J. S. Garner, *In re* A. A. Howlett *v.* The Central Carolina Land and Improvement Company. The following is the Circuit decree:

The preliminary facts, so far as necessary to state in this proceeding, are as follows: On March 16th, 1891, a judgment of foreclosure and sale in the usual form was granted in the action. The sheriff of Darlington County, after due advertisement, offered the property for sale on the first Monday in January, 1892. Besides a large tract of land, the mortgaged premises consisted of ten lots, recently laid out, within the corporate limits of the town of Darlington, all of which, with the exception of two, were entirely unimproved and lying upon streets unnamed and not regularly used. The mortgagee became the purchaser of all the property, except lot No. 7, which was bid off by Dr. J. S. Garner, and lot No. 10, of which Dr. Garner and J. B. Law became the joint purchasers. At the June, 1895, term of the Court, the sheriff made his report on sales, in which, after reciting the proceedings, he says: "And I do further certify and report that J. S. Garner has never complied with his bid for lot No. 7, as mentioned and described herein. And I do further certify and report that A. A. Howlett has never complied with his bid for lot No. 1, as mentioned and described herein, and refuses to comply therewith, for the reason that by mistake it was announced at the sale that lot No. 1 was the lot on which there were valuable improvements, consisting of six tenement houses, and, laboring under this mistake, plaintiff bid on the same and ran the same up to $1,600, while, as a matter of fact, lot No. 1 was sold merely to perfect the title of the Charleston, Sumter and Northern Railroad thereto, and was of no value whatever, as the defendant company had no interest therein. The mistake consisted in mistaking lot No. 1 for lot No. 10 herein. And I do further certify and report that I have executed, acknowledged, and delivered to J. S. Garner the usual sheriff's deed for lot No. 10, as mentioned and described herein (J. B. Law having assigned to said J. S. Garner his interest in the said bid therefor); and that I have in hand the sum of $250, the purchase money of the same, which the plaintiff refuses to receive, for the reason that the

lot sold as lot No. 10 was, by mistake, supposed to be lot No. 1, it having been announced at the sale that the said lot No. 10 was the lot on which the C., S. & N. depot was located, and that it was sold merely for the purpose of perfecting the title of the railroad company, and that the plaintiff had no claim against the same whatever, while, as a matter of fact, said lot No. 10 is a valuable piece of property, on which there are six tenement houses, and which was mistakenly supposed to have been bid in by the plaintiff as lot No. 1. That said mistake was not discovered until after the deed for said lot No. 10 had been executed and delivered to said J. S. Garner." Upon hearing the return, his Honor, Judge Witherspoon, granted a rule wherein it was ordered, "That said J. S. Garner do show cause before this Court, on the first day of the next term thereof, at 10 o'clock in the forenoon, or as soon thereafter as counsel can be heard, why the sale of lot No. 10, in the advertisement of said land, and bid off by him, should not be set aside, and the deed executed to him be cancelled." To this rule Dr. Garner made return, and numerous affidavits were submitted on both sides. The cause, however, was not heard, as an order of reference was granted, on motion of counsel for the plaintiff, and with the written consent of defendant's attorneys and the attorneys of Dr. Garner, referring the issues of law and fact to the master of Darlington County. On February 20, 1896, the master filed his report, and it is upon exceptions to this report that the matter came up to be heard by me. The master finds, from a review of the whole testimony, "That it is not of that conclusive character * * * as is required in a proceeding of this kind," and, therefore, recommends that the rule against Dr. Garner be discharged and the conveyance confirmed.

The exceptions are numerous, but as they cover practically the whole controversy, I do not propose to consider them seriatim, but will confine myself to a consideration of the only two questions involved, namely: Was there a mutual mistake in the sale and purchase of lot No. 10? Was that

mistake of such a nature as will authorize a court to set aside the sale and direct the deed given therefor cancelled? I will state, by way of preliminary, that no question was made before me as to the mode of procedure, or whether or not the questions involved could be determined upon a rule to show cause. The order of reference was granted by consent of all parties, the matter was fully argued before me as upon a trial *de novo*, hence the question of the mode of procedure does not arise.

The facts as I find them are as follows: The mortgage upon which the judgment was recovered was given to the plaintiff, Alfred A. Howlett, who is a citizen and resident of the city of Syracuse, N. Y., to secure the payment of the sum of $17,500, with six per cent. interest, loaned the defendant, a corporation, chartered and organized under the laws of this State. Mr. Howlett had no personal knowledge of the situation or value of any of this property, as the whole transaction on his part had been conducted through an agent. Messrs. Nettles & Nettles were the attorneys of the plaintiff in the recovery of the judgment, Knox Livingston, Esq., becoming associated with them some time in the early part of 1891. C. S. Nettles, Esq., the junior member of the said firm, was the counsel of the defendant corporation. No part of the mortgage debt or interest having been paid, a sale was determined upon, and for that purpose Mr. Livingston, who had immediate charge of the matter, went over to Darlington to acquaint himself with the situation of the property, the identity of the several lots, and their several values. He examined the records, had an interview with Mr. Nettles, who purchased the lots originally for the defendant company, and also negotiated the loan, and also with other citizens of Darlington, and otherwise did what a prudent and careful man could to inform himself and protect the interests of his client. He was informed, among other things, that lot No. 1, as designated in the judgment of foreclosure and sale, and also in the advertisement, was the "Mooney lot;" that

on it were situate six tenement houses, and that it was the most valuable of all the lots to be sold. That this information was given him in the utmost good faith, no one questions. The mistake in the identity of the two lots was a natural one, as will hereafter appear. He was also told that lot No. 10 was the lot on which the Charleston, Sumter and Northern Railroad depot buildings were situate, and which the defendant company, before the execution of the mortgage, had contracted to convey to said railroad corporation. The only object in selling this lot was to perfect the title of the railroad company to it. On the day of sale, after the advertisement was read, Mr. Livingston gave the bystanders such further information in reference to the situation of the respective lots, the improvements, etc., as he had obtained. This was done for enhancing the price as much as possible. When lot No. 1 was offered, it was stated that it was the "Mooney lot," on which there were six tenement houses in good order. With this understanding, the bidding was spirited, Messrs. Nachman, Smith, Livingston and others, including several of the witnesses, say Dr. Garner being among the bidders. It was finally knocked down to the plaintiff, at $1,600. When lot No. 10 was reached, it was stated that it was the lot on which were situate the C., S. & N. R. R. depot buildings, and that the sale was made only for the purpose of perfecting the titles of that corporation to the property under a contract of purchase with the defendant company. Several bids were made upon this property, but it was knocked down to Dr. J. S. Garner and Mr. J. B. Law, for the sum of $250. As a matter of fact, lot No. 1 was the "railroad lot," and lot No. 10 was the "Mooney lot," by which designations they will be respectively referred to hereafter.

The master finds as a matter of fact that the statements above referred to were made, and that Mr. Livingston, the agent of the plaintiff, and it may be others, labored under the mistake that the railroad lot was the Mooney lot, and *vice versa.* In this finding I fully concur. He, however,

finds that the testimony that Dr. Garner was under the same impression and mistake, is not of "that conclusive character as is necessary in a proceeding of this kind." This, it seems to me, is inconsistent. The same testimony which establishes the one fact unquestionably proves the existence of the other, and when this testimony is taken into consideration with other facts and circumstances appearing in the cause, the fact that Dr. Garner, when he and Mr. Law bid off lot No. 10, did so with the understanding and mistaken belief that he was purchasing the railroad lot, is most clearly established to my satisfaction. Mr. Law, who was the joint purchaser with Dr. Garner, testifies that he did not attend the sale with the purpose of purchasing any of the property; that when lot No. 10 was offered, and it was announced to be railroad property, Dr. Garner suggested to him that it would be a good investment; that both he and Dr. Garner asked Mr. C. S. Nettles, who was present, if their title would be good against the railroad if they bought the property; that Mr. Nettles replied that in his opinion it would; that, under this belief, they entered into an arrangement to buy and bid off the property. Mr. Nettles fully sustains and corroborates Mr. Law as to what took place at this interview. There is nothing to rebut this testimony. Dr. Garner contents himself with a simple "I don't recollect." Again, the circumstances attending the transaction, when Mr. Law sold and conveyed his interest in the property to Dr. Garner, clearly indicates that the property was bought as the railroad lot, and, so far as Mr. Law is concerned, he was still under that belief and impression when he sold his interest. Nothing that he had seen or heard had given him the slightest idea of the mistake that had been made in confounding the Mooney and the railroad lots. Mr. C. R. Woods' testimony not only corroborates the other witnesses on this point, but establishes as a substantive fact the view I take. Dr. Garner, throughout his long examination, never denies, in that emphatic manner which carries conviction, that he bought the

property as the railroad lot. The circumstances, too, sustain this view of the transaction. All the witnesses who spoke upon the subject stated that it was "town talk" that Garner and Mr. Law had bought the property on which stood the railroad buildings. Mr. Livingston, upon being informed, at once wrote to Dr. Garner on the subject; receiving no reply, wrote again, and to this second letter no answer was sent. It is true, Dr. Garner denies having received the first letter (a press copy of which is in evidence), but he admits receiving the second. Why this silence? The price, too, for which the property was sold is a most pregnant circumstance. The witnesses testify to, and the master finds as a matter of fact, that the Mooney lot is worth $2,000. Yet it is sold for $250. Would it not be remarkable that property of that value should bring such a low price, unless explainable upon some hypothesis similar to that presented? Nor is it surprising, under the circumstances, that the mistake should have been made. The lots all lay in an unimproved portion of the town of Darlington, on streets, most of which, while laid off, were unnamed and used only as footpaths. The area of the two lots in question is almost the same, and the boundaries very similar. It was not an erroneous impression spontaneously taken up, but the appearances were such as were liable to mislead a person of even more than ordinary prudence and care. That such is a fact the testimony shows, that such prudent men as Messrs. Nachman, Ward, Law, Smith and others, all citizens and long residents of Darlington, were actually misled as to the physical identity of the two lots. Mr. Nettles, in his testimony, very clearly shows how he was misled, and why he gave the information he did to Mr. Livingston. I am, therefore, clearly of the opinion, and find as a matter of fact, that a mutual mistake occurred in the sale and purchase of lot No. 10, and that while it was sold and purchased as the railroad lot, it was in fact the Mooney lot.

Having reached this conclusion upon the facts, the second

question arises: Is the mistake of such a nature as will authorize the Court to set aside the sale and direct the deed cancelled? Relief, on account of mistake of fact, has played a most important part in the Court since the earliest establishment of equitable jurisdiction and principles. The difficulties arising in considering the subject and the seeming conflict of decisions in reference thereto, are due largely to the many and varied cases in which the principles are invoked and relief sought. "The general doctrine," says Pomeroy, in his admirable work on Equity Jurisprudence, sec. 852, "is firmly settled as one of the elementary principles of the equitable jurisdiction that a court of equity will grant its affirmative or defensive relief, as may be required by the circumstances, from the consequences of any mistake of fact which is a material element of the transaction, and which is not the result of the mistaken party's own violation of some legal duty, provided that no adequate remedy can be had at law. It has been said, 'No person can be presumed to be acquainted with all matters of fact connected with the transaction in which he engages.' This general doctrine is applied in a great variety of forms and under a great variety of circumstances. It presents but few theoretical difficulties; its practical difficulties arise from its application to particular instances of relief, and this application must be largely controlled by the circumstances of each case." Mistake, the same author defines to be, "An erroneous mental condition, conception or conviction induced by ignorance, misapprehension or misunderstanding of the truth, but without negligence, and resulting in some act or omission done or suffered erroneously by one or both the parties to a transaction, but without its erroneous character being intended or known at the time." Sec. 839. "The notion of mistake," says Chancellor Harper, in *Gilchrist* v. *Martin*, Bail. Eq., 494, "such as entitles a party to relief from his contract, seems to me to involve the having been misled by some false appearance. If a man spontaneously takes up an erroneous impression, not

from any deceptive evidence, but merely from the suggestion of his own mind, this can hardly be called a mistake." "The most important remedies conferred by an exercise of the equitable jurisdiction on the occasion of mistake are cancellation and reformation. Cancellation is appropriate when there is apparently a valid written agreement or transaction embodied in writing, while in fact, by reason of a mistake of both or one of the parties, either no agreement at all has really been made, since the minds of both parties have failed to meet upon the same matters, or else the agreement or transaction is different with respect to its subject matter or terms from that which was intended." 2 Pom. Eq. Jur., section 870. "A fundamental mistake, which prevents any real contract from being formed between the parties, is ground for relief both at law and in equity. Contract requires consensual agreement; and if, owing to some error on one or both sides, the parties never had a common intention, it follows that no contract is formed." Fetter Eq., p. 122; see, also, 15 A. & E. Enc. Law, 645. It is needless to multiply quotations from text writers to further establish this equitable doctrine. When the mistake is mutual, material, unintentional, and free from negligence on the part of the party applying for relief, equity will in every instance, where the rights of innocent third parties have not interposed, grant the relief. The circumstances of each case are apt to differ, and each case must stand for itself upon its own relative circumstances. The case under consideration comes peculiarly within the principles laid down. That the mistake was mutual is clearly established; that it is material is unquestionable; that it was unintentional all parties concede; and that it was not caused by any negligence is apparent. It is not one of those cases where a party spontaneously took up an erroneous impression, but the facts and circumstances demonstrate that the parties were misled by the false appearances of similarity of boundaries, area, &c. Mr. Livingston's efforts, as the representative of the plaintiff, to

properly identify and locate the different lots, show affirmatively the absence of negligence, and it appears that he did all that could be required of a prudent man. This doctrine applies peculiarly to judicial sales. A court of equity cannot, in good conscience, and will not, permit a party within its jurisdiction to be wronged by another, when the position of the parties is the result of an honest mistake of fact, which was mutual to both. Rorer on Jud. Sales, 238–9; 12 A. & E. Enc. Law, 235; 15 *Id.*, 659. "If grounds exist which would authorize a court of equity to correct a conveyance for a mistake in a private sale, the same state of facts would authorize such correction in the case of a judicial sale."

I have not been able to find, nor has counsel on either side cited to me, any case in our own reports exactly analogous to the one under consideration, but the principles I have laid down are recognized in several. In *Cunningham* v. *Cunningham*, 20 S. C., 331, the question involved was as to the effect of a mistake made in the construction of a will. This was a mistake of law, and for that reason the Court held that it could not be relieved against. In its consideration, however, the Court says: "If the mistake of this transaction had been one of fact, without any improper negligence on her part, all the authorities agree that the Court could give relief, if application be made in due time." In *Kennerty* v. *Etiwan Phos. Co.*, 21 S. C., 234, the relief demanded was very properly refused, upon the ground that the case could not possibly fall under the head of mutual error, nor that of a mistake occasioned by fraud, imposition, misplaced confidence or overreaching by one party against another, but the Court enunciates the general doctrine in the following language: "The cases in which the question of relief in equity may arise in connection with an instrument in writing executed by the parties, may be divided into several classes: 1. Where there is mutual mistake as to the facts upon which it is based, or as to the terms and stipulations embraced therein. 2. Where one of the parties only is under such

mistake, either of the facts or of the stipulations, and such mistake has been occasioned by the fraud, deceit or imposition in any form of the other.   3. Where one of the parties only is under such mistake, and this has occurred from no fault of the other, but solely by the negligence or inattention of the first party.   In the first two classes, where the mistake is made to appear by clear and competent testimony, equity will unhesitatingly afford the necessary relief, either by reforming the paper or cancelling it, as the case may require."   The case at bar, in my opinion, comes under the first of the classes enumerated, and hence is one in which the Court will relieve from the mistake mutually made.   Neither the case of *Murrell* v. *Murrell*, 2 Strob. Eq., 148, *McDowell* v. *Brown*, 2 S. C., 108, nor *Trapier* v. *Waldo*, 16 *Id.*, 276, will be found, upon correct interpretation, to conflict with the views here presented.   In the last mentioned case the Court had refused to confirm it; it would have been necessary to have violated a fundamental legal principle.   So in this case, to confirm the sale to Dr. Garner, would undoubtedly be to violate not only a fundamental principle of equity, but, as I will hereafter endeavor to show, a fundamental principle governing judicial sales.   While, as before stated, I have found no case in this State exactly analogous, yet there are cases from the courts of last resort in other States which are very similar.   I will not, however, burden this opinion with quotations from them, but will simply cite them: *Miles* v. *Stevens*, 45 Am. Dec., 621, and note; *Fore* v. *Foster*, 9 S. E. R., 497; *Baxter* v. *Tanner*, 12 S. E. R., 1095; *Erwin* v. *Wilson*, 15 N. E. R., 209; *Muhlenburg* v. *Henning*, 9 At. R., 144; *Griffith* v. *Sebastian County*, 3 S. R. W., 886; *Barnard* v. *Yates*, 1 N. & McC., 142; *Chamroys* v. *Johnson*, 2 Brev., 268; *Rupert* v. *Dunn*, 1 Rich. Eq., 101.   The cases of Erwin *v.* Wilson, Griffith *v.* Sebastian County, and Baxter *v.* Tanner, *supra*, are very full, and the facts in each case are somewhat similar to the case at bar.

There is another view of the case presented by counsel which, in my opinion, will authorize the interference of the

Court.  It clearly appears from the testimony that the an-
nouncements made at the sale, though made in perfectly
good faith, was an interference with the *bona fides* of the
sale.  When it was stated that lot No. 1 was the Mooney
lot, Mr. Nachman, Mr. Ward, Mr. Smith and others bid upon
it upon the faith of that announcement.  When this lot was
knocked down, they made no other bid during the sale.  Mr.
Nachman, and possibly others, soon afterward retired from
the sale, believing that the Mooney lot had been disposed
of.  When, therefore, the Mooney lot was offered for sale
under the name of the railroad lot, none of these gentlemen
made a bid therefor, and property worth $2,000 was sold for
the grossly inadequate price of $250.  While it is unques-
tionably the policy to sustain judicial sales, yet, as Justice
McGowan says, in *Trapier* v. *Waldo*, 16 S. C., 281, such is
the case, "when it can be done without violating principles
or injuring any one."  One of the principles "which governs
all sales at auction, and especially judicial sales, is that there
should be full and fair competition." *Hamilton* v. *Hamilton*,
2 Rich. Eq., 255: "Anything by a party in interest that chills
the sale—prevents free competition amongst the bidders—
will, on complaint, cause such a sale to be set aside."  Per
Mr. Justice Pope, in *Herndon* v. *Gibson*, 38 S. C., 360.
See, also, *Farr* v. *Sims*, Rich. Eq. Cases, 122; *Dudley* v.
*Odum*, 5 S. C., 131; *Bartlett* v. *Bath Paper Co.*, 13 *Id.*,
138, and *Herndon* v. *Gibson*, as reported in 20 L. A. R.,
545, with notes.  The remarks made by the late lamented
Judge Kershaw, in his able and learned Circuit decree in
*Bartlett* v. *Bath Paper Co.*, *supra*, are so apposite to the
case at bar that I close by quoting therefrom: "This state-
ment" (referring to an announcement made at the sale),
"though made in perfectly good faith, was an interference
with the *bona fides* of the sale.  It depreciated the property
and impaired competition at the sale.  Had it been made
with fraudulent intent, it would have certainly vitiated the
sale.  * * *  It had all the effect it could have had if fraudu-
lently made.  It was a misrepresentation of fact, however

unintentional, and wrought a great wrong upon those interested in the property. * * * The parties at the sale acted upon it. It was, in law, a fraud upon the sale, and innocent parties should not be allowed to suffer. The inadequacy of price, considered with reference to this erroneous announcement, is such as to shock the moral sense and outrage the conscience, and the sale ought not to stand. * * * Rorer on Jud. Sales, sec. 855, note 5. It is not consistent with the public policy that a sale whose fairness is so vitally impaired by a mistaken announcement should stand, whether the intent be fraudulent or not. It was urged at the hearing that there is a difference between the cases when the contract is executed and when it is merely executory; that in cases of the former sort, the Court will not interfere, unless they be tainted by actual fraud. While this is admitted to have some appearance of authority in the decided cases, yet there are many others in which the principles which have made the ground of a refusal on the part of the courts to aid in the execution of an executory contract, or confirm a judicial sale when submitted to them for confirmation, have been evoked to set aside a sale under process."

My conclusions, therefore, are, as matter of law: 1. That a mutual mistake occurred in the sale and purchase of lot No. 10, material, unintentional, and free from negligence, and such as the Court will relieve against. 2. That the sale made by the sheriff of Darlington County on the first Monday in January, 1892, is rendered null and void by the circumstances attending it. There was no actual fraud, however, and it would be inequitable to make Dr. Garner suffer any pecuniary loss. The testimony shows that the aggregate sum paid by him to the sheriff for the purchase money of the land and to J. B. Law for his interest in the bid amounts to $487.50. The referee reports that the rental value of the property is $10 per month. Dr. Garner, however, testifies that he collected only an average of about $8 per month, and I do not think that he ought to be required to account for more than he actually received. A proper

basis of settlement, therefore, will be for the master to charge Dr. Garner with $8 per month from the first day of February, 1892, and credit him with the sum of $487.50. Should there be any difference, it should be paid out of the proceeds of the sale. To properly adjust the matter, it will be necessary for the sheriff to turn over to the master any funds he may have on hand from the former sale, less any unpaid costs and expenses due him.

From this decree Garner appeals.

*Messrs. Boyd & Brown*, for appellant, cite: *Mutual mistake:* 21 S. C., 234; 2 Strob. Eq., 148; 19 Ark., 522; 3 N. J. Eq., 517; 1 Ves. Sr., 126; 4 John Ch., 566; Rice Eq., 5; Harp. Eq., 54; Bail. Eq., 20. *Mutual mistake cannot apply:* 8 S. C., 20; 2 Bail., 418; 2 Hill. Ch., 580; McM. Eq., 190; Rice Eq., 9; 9 S. C., 288; 13 S. C., 209; 3 S. C., 117; 16 S. C., 281; 41 S. C., 516; 20 S. C., 333; 1 McC., 424; 26 S. C., 47; 13 S. C., 159. *Judicial sales supported:* 16 S. C., 281; 18 S. C., 121; 23 S. C., 514; 25 S. C., 280; Rice Eq., 5; 25 N. J. Eq., 27; 35 S. C., 359; 93 U. S., 55.

*Messrs. Knox Livingston* and *Nettles & Nettles*, contra (no printed argument).

July 12, 1897. The opinion of the Court was delivered by

MR. JUSTICE JONES. Under a decree in the principal cause above stated, the sheriff of Darlington County, on January 2d, 1893, sold at public auction a number of lots in the town of Darlington. Among these lots were lot No. 1, which may be called the "railroad lot," containing the depot of the C., S. & N. R. R. Co., and lot No. 10, called the "Mooney lot," containing several tenement houses. The railroad lot, No, 1, was sold to perfect title. The Mooney lot, No. 10, was considered valuable, by reason of the tenement houses. The two lots differed very little in size and description, as advertised. When lot No. 1 was offered for sale, the attorney for plaintiff, by mistake arising from

incorrect information received from the former attorney in the cause, announced that lot No. 1 was a lot on which were situated six tenement houses, and as attorney for plaintiff, bid on it under that belief. After some competitive bidding, this lot was knocked down to plaintiff at $1,600. When lot No. 10 was offered for sale, plaintiff's attorney announced that it was sold subject to a claim of the Charleston, Sumter and Northern Railroad Company, the company claiming it under a grant of right of way and for depot grounds, that it was the lot on which the depot was to be built, that any one who bought it would do so at his risk. This lot was knocked down to J. S. Garner and J. B. Law, at $250. Garner and Law complied with the terms of sale, received titles from the sheriff, and some time afterwards Law conveyed his interest in the premises to Garner. Garner took possession of the premises. Afterwards plaintiff's attorney discovered the mistake in the sale of the lots, and proceeded to have a rule issued requiring Garner to show cause why the sale should not be set aside, on the ground that same was made under a mutual mistake of fact. On the return to the rule, by consent of parties, the issues raised were referred to the master of Darlington County. The master reported that the evidence was insufficient to establish a case of mutual mistake, and that even if there was a mutual mistake, it was not such as is relievable in equity. Accordingly, he recommended that the rule against Garner be discharged, and the conveyance to Garner and Law be confirmed. The Circuit Court reversed the master's report, holding that there was a mutual mistake, and that the mistake was such as a court of equity should relieve against, and accordingly decreed that the deed to Garner and Law be cancelled and the sale set aside, that the premises be resold, that Garner should account for the rent received by him from the premises since February 1st, 1892, at $8 per month, and should be credited with $487.50, the aggregate amount paid to the sheriff in purchase of the lot, and to J. B. Law for his interest therein,

the difference to be paid to Garner from the proceeds of the sale, and that Garner should pay the costs and expenses of the rule.

The exceptions raise practically three questions: 1. Was there a mutual mistake, and such a mistake as is relievable in equity? 2. Should Garner be allowed credit for taxes, repairs and other expenses on the premises against rent received? 3. Should Garner be charged with the costs of the proceeding?

1. After a careful examination of the testimony, we agree with the Circuit Judge that a mutual mistake occurred in the sale and purchase of lot No. 10, and that while it was sold and purchased as the railroad lot, No. 1, it was in fact the "Mooney" lot. This conclusion is so well supported by the facts as summarized by the Circuit Judge that we need do no more than refer to his decree, which will be reported. That such a mistake is one relievable in equity is also well sustained by authority.

2. We think, however, that it was error not to allow Garner, as against the rents of the property received by him, credit for taxes which he may have paid on the property, and also for any expenditure he may have made in necessary repairs on the property.

3. As to the matter of costs, we will not interfere with the discretion of the Circuit Court.

The judgment of the Circuit Court is modified in accordance with the principles herein anounced, and the cause remanded to the Circuit Court for further proceedings in accordance herewith.